# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,<br>   600 Fifth Street, N.W.<br>   Washington, D.C. 20001<br><br>   Plaintiff,<br><br>v.<br><br>LOCAL 689, AMALGAMATED TRANSIT UNION,<br>   2701 Whitney Place<br>   Forestville, MD 20747<br><br>   c/o Jackie Jeter<br>   President and Business Agent<br>   2701 Whitney Place<br>   Forestville, MD 20747<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 1:18-cv-1370<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFIED COMPLAINT TO ENJOIN ARBITRATION AND FOR DECLARATORY AND OTHER RELIEF

Washington Metropolitan Area Transit Authority ("WMATA"), by and through undersigned counsel, as and for its Verified Complaint against Local 689, Amalgamated Transit Union ("Local 689" or "Union"), states as follows:

### Introduction

1.      This Complaint seeks to enjoin and prevent Local 689 from pursuing grievances and arbitrations challenging provisions of WMATA's 2012 criminal background screening policy and WMATA's 2017 criminal background screening policy when such actions in whole or in part: (A) are contrary to the provisions of the Compact (defined below) applicable to WMATA; (B) are not a proper subject of arbitration under the Compact or the terms of agreements between WMATA and Local 689, including the parties' collective bargaining

agreement and a specific December 7, 2016 agreement between the parties concerning background screening policies; (C) raise issues concerning rights of management which Local 689 has waived; and/or (D) contravene the injunction and order entered by the Court in the related cases of *Little v. Washington Metropolitan Area Transit Authority*, Case No. 1:14-cv-1289 (RMC) (D.D.C.) ("*Little v. WMATA*"), and/or *Washington Metropolitan Area Transit Authority v. Local 689, Amalgamated Transit Union*, Case No. 1:15-cv-536 (RMC) (D.D.C.) ("*WMATA v. Local 689*").

2.      In particular, WMATA seeks to enjoin a grievance arbitration initiated by Local 689, and set for June 19, 2018, seeking to arbitrate various issues and applications of WMATA's current criminal background screening policy. The arbitration may not proceed, and must be enjoined, because (A) Local 689 has not identified any current WMATA employee who is a Local 689 bargaining unit member that has been adversely affected by the application of WMATA's current criminal background screening policy; (B) the grievance purports to raise issues regarding the alleged discriminatory impact of WMATA's current criminal background screening policy, which issues are not arbitrable, may not be considered or decided in arbitrations, and must be adjudicated, if at all, in a court action; (C) the grievance purports to raise issues regarding WMATA's adoption and implementation of the current criminal background screening policy, which issues delve into the non-arbitrable realm of WMATA's management and operations and also management rights which have been waived by the Union; (D) the subject matter of the grievance is part of the subject matter of the duly negotiated, executed, and Court-approved settlement agreement in *Little v. WMATA*; (E) the grievance seeks to arbitrate issues that Local 689 agreed not to raise pursuant to a December 7, 2016 agreement between the parties; and (F) the grievance is premature in whole or in part.

3.      Further, WMATA seeks to enjoin a grievance arbitration initiated by Local 689 seeking to arbitrate various issues and applications of WMATA's prior, now discontinued, criminal background screening policy. The arbitration may not proceed, and must be enjoined, because (A) Local 689 has not identified any current WMATA employee who is a Local 689 bargaining unit member that has been adversely affected by the application of WMATA's prior, discontinued criminal background screening policy; (B) the grievance purports to raise issues regarding the alleged discriminatory impact of WMATA's prior, discontinued criminal background screening policy, which issues are not arbitrable, may not be considered or decided in arbitrations, and must be adjudicated, if at all, in a court action; (C) the grievance purports to raise issues which delve into the non-arbitrable realm of WMATA's management and operations and also management rights which have been waived by the Union; (D) the subject matter of the grievance is the primary subject matter of the duly negotiated, executed, and Court-approved settlement agreement in *Little v. WMATA* and further is barred by the Court's order approving the *Little v. WMATA* settlement; (E) the subject matter of the grievance is the primary subject matter of the permanent injunction entered by this Court in *WMATA v. Local 689*; and (F) the grievance seeks to arbitrate issues that Local 689 agreed not to raise pursuant to a December 7, 2016 agreement between the parties.

4.      Further, WMATA seeks to confirm the Court's prior injunction against two grievance arbitrations initiated by Local 689 seeking to arbitrate various issues and applications of WMATA's prior, now discontinued, criminal background screening policy. The arbitrations may not proceed because (A) the grievance arbitrations were permanently enjoined by Order of this Court entered July 14, 2015; (B) Local 689 did not show that any current WMATA employee who was a Local 689 bargaining unit member had been adversely affected by

WMATA's prior, discontinued criminal background screening policy; (C) the grievances purport to raise issues regarding the alleged discriminatory impact of WMATA's prior, discontinued criminal background screening policy, which issues are not arbitrable, may not be considered or decided in arbitrations, and must be adjudicated, if at all, in a court action; and (D) the subject matter of the grievances is the primary subject matter of the duly negotiated, executed, and Court-approved settlement agreement in *Little v. WMATA* and further is barred by the Court's order approving the *Little v. WMATA* settlement.

5.      As more fully described herein, this case is related to *Little v. WMATA*, Case No. 1:14-cv-1289 (RMC) (D.D.C.), and *WMATA v. Local 689*, Case No. 1:15-cv-536 (RMC) (D.D.C.), and should be treated as such for purposes of the Court's rules and administrative procedures.

### Parties

6.      WMATA is an interstate-compact agency and instrumentality of the District of Columbia, the State of Maryland, and the Commonwealth of Virginia. WMATA was created by interstate Compact approved by Congress and codified at D.C. Code § 9-1107.01; Md. Code, Transportation, § 10-204; and Va. Code §§ 56-529 to 56-530 (the "Compact" or "WMATA Compact"). WMATA operates a public transportation system in the District of Columbia, Maryland, and Virginia.

7.      Local 689 is and has been an unincorporated labor organization/union that represents non-managerial, non-supervisory staff, operators, mechanics, maintenance personnel, and clerical personnel that WMATA employs, for purposes of collective bargaining.

8.      In Section 66(b) of the Compact, Congress authorized WMATA to enter into written contracts with employees through accredited representatives of the employees or through

representatives of any labor organization authorized to act for the employees. Pursuant to, and exercising their rights and authorizations under, Section 66(b) of the Compact, WMATA and Local 689 entered into the Collective Bargaining Agreement between WMATA and Local Union 689 of the Amalgamated Transit Union AFL-CIO effective from July 1, 2012 through June 30, 2016 (the "CBA"). A true and correct copy of the Collective Bargaining Agreement is attached to this Complaint as **Exhibit 1** and is incorporated into this Complaint by reference. Pursuant to the Compact and the CBA, the terms of the CBA remain in effect until the parties negotiate a new agreement or, if arbitration is invoked, an award is rendered. Compact, § 66; Ex. 1, § 105. The parties currently await an award from an interest arbitrator.

9.      In the CBA, Local 689 recognized, acknowledged, and agreed that the Compact is the foundation of and authorization for the CBA, that the Compact sets limits and standards for the CBA, and that the CBA is subject to the Compact. Ex. 1, § 102.

10.      Included in Local 689's recognition, acknowledgment, and agreement that the Compact is controlling are these provisions in Section 102 of the CBA:

A.      "The legal rights, obligations and responsibilities of the Authority and the Union with regard to collective bargaining and resort to binding interest arbitration are specified in the WMATA Compact." Ex. 1, § 102.

B.      "The Union acknowledges that all matters pertaining to the management of operations, including … the hiring and establishment of standards for selection and qualification of employees, … are the prerogatives of the Authority and are reserved by the Authority unless expressly waived …." *Id.*

**Jurisdiction and Venue**

11.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 81 of the Compact. United States District Courts have original jurisdiction of all actions brought by or against WMATA pursuant to Section 81 of the Compact (Pub. L. 89-774).

A.     In Public Law 86-794, 74 Stat. 1081 (Sept. 15, 1960), Congress established the Compact and the terms of the Compact and granted consent and approval to the District of Columbia, Maryland, and Virginia to enter into the Compact "related to the regulation of mass transit in the Washington, District of Columbia metropolitan area, and for other purposes." Since the Compact's enactment in 1960, Congress modified the Compact and granted consent and approval to the District of Columbia, Maryland, and Virginia for modifications: Nov. 6, 1966, 80 Stat. 1324, Pub. L. 89-774, § 1; July 13, 1972, 86 Stat. 466, Pub. L. 92-349, title III, § 301; Oct. 21, 1972, 86 Stat. 1000, Pub. L. 92-517, title I, § 101; June 4, 1976, 90 Stat. 672, Pub. L. 94-306, § 1 (1)-(4).

B.     "Since the Compact is an interstate agreement which requires the consent of Congress, such Congressional consent transforms the Compact into an agreement pursuant to federal law. … [I]nterpretation of the terms and conditions of the Compact is, therefore, governed by federal law." *Pievsky v. Ridge,* 98 F.3d 730, 733 (3d Cir. 1996) (citations omitted). *See Petty v. Tennessee-Missouri Bridge Comm'n*, 359 U.S. 275, 278 & n.4 (1959) ("The construction of a compact sanctioned by Congress under Art. I, s 10, cl. 3, of the Constitution presents a federal question. … Moreover, the meaning of a compact is a question on which this Court has the final say. … That is true even though the matter in dispute concerns a question of state law on which the courts or other agencies of the State have spoken.").

C.     "The legal rights, obligations and responsibilities of the Authority and the Union with regard to collective bargaining and resort to binding interest arbitration are specified in the WMATA Compact." Ex. 1, § 102(b).

D.     In Section 66(c) of the Compact, Congress granted WMATA the authority and ability and established WMATA's obligation to arbitrate labor disputes with its employees, and Congress established the arbitration rights and obligations of, and limitations on, WMATA, its employees, and Local 689 as their representative, in arbitration.

E.     WMATA seeks a determination under the Compact that Local 689's grievances of WMATA's criminal background screening policies and procedures are not arbitrable under Compact Section 66(c) or under the CBA entered into pursuant to Compact Section 66(b). The question of arbitrability under the Compact and the CBA is one for judicial determination. *See Washington Metro. Area Transit Auth. v. Local 2, Office & Prof'l Employees Int'l Union, AFL-CIO*, 965 F. Supp. 2d 13, 47 (D.D.C. 2013) (noting that Compact does not "explicitly authorize the arbitrator to determine arbitrability"); *Local 1764, Amalgamated Transit Union v. WMATA*, Case No. PWG-14-334, 2015 WL 1471967, at *7 (D. Md. Mar. 20, 2015) ("'The general rule is that whether particular disputes are arbitrable under a contractual arbitration clause are questions for the court to decide as a matter of contract interpretation.'") (citation omitted); *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 547 (1964) ("The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty.").

F.     The Compact does not direct arbitration for grievances that are not grounded in a dispute involving an affected WMATA employee. *Washington Metro. Area Transit Auth. v. Local 689, Amalgamated Transit Union*, 113 F. Supp. 3d 121, 127 (D.D.C. 2015); *see* Compact, § 66(c).

G.     WMATA did not agree to arbitration of (1) claims alleging violations of the Civil Rights Act of 1964, as amended, in general, (2) claims alleging violations of Title VII of the Civil Rights Act in particular, including claims brought alleging violations of 42 U.S.C.A. § 2000e–2(k), (3) claims alleging discrimination in violation of any other statute, or (4) claims not by or on behalf of a particular WMATA employee who is a Local 689 member and/or that do not allege discrimination against and resulting harm to a particular WMATA employee who is a Local 689 member.

H.     Further, WMATA did not agree to arbitration of issues concerning rights which have been waived by Local 689 as well as the exercise of management rights pertaining to WMATA's management and operations, and in particular the hiring and establishment of standards for selection and qualification of employees.

I.     WMATA is entitled to bring this Complaint to determine arbitrability of the grievances described herein. "[I]f 'an arbitration agreement does not say who is to decide the question of arbitrability and the parties do not otherwise consent to arbitration of that question, then arbitrability is an issue for *de novo* judicial determination.' … Because there is no clear evidence of consent here [referring to the Compact], the Court will therefore review arbitrability *de novo*." *WMATA v. Local 2, Office & Prof'l Emps. Int'l Union*, 965 F. Supp. 2d at 48.

J.     Arbitrations of labor disputes involving WMATA are governed by the federal common law of arbitration. *See Fraternal Order of Police Labor Comm.* v. *WMATA,* 780 F.3d 238, 2015 WL 1019650, at *3 (4th Cir. Mar. 10, 2015).

K.     Accordingly, the court has federal question jurisdiction.

12.     Venue is proper in this court pursuant to Section 81 of the WMATA Compact and 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to this Complaint occurred in the District of Columbia.

## Facts Giving Rise to the Claim for Relief

### The Compact

13.     WMATA is governed by the WMATA Compact. *See* Compact.

14.     Section 66(b) of the Compact authorizes and directs WMATA to "deal with and enter into written contracts with employees as defined in section 152 of Title 29, United States Code, through accredited representatives of such employees or representatives of any labor organization authorized to act for such employees concerning wages, salaries, working conditions and pension or retirement provisions."

15.     Section 66(c) of the Compact provides:

(c) In case of any labor dispute <u>involving the Authority and such employees</u> where collective bargaining does not result in agreement, the Authority shall submit such dispute to arbitration by a board composed of three persons, one appointed by the Authority, one appointed by the labor organization representing the employees, and a third member to be agreed upon by the labor organization and the Authority. The member agreed upon by the labor organization and the Authority shall act as chairman of the board. The determination of the majority of the board of arbitration, thus established shall be final and binding on all matters in dispute. If after a period of ten days from the date of the appointment of the two arbitrators representing the Authority and the labor organization, the third arbitrator has not been selected, then either arbitrator may request the Federal Mediation and Conciliation Service to furnish a list of five persons from which the third arbitrator shall be selected. The arbitrators appointed by the Authority and the labor organization, promptly after the receipt of such list shall

determine by lot the order of elimination, and thereafter each shall in that order alternatively eliminate one name until only one name remains. The remaining person on the list shall be the third arbitrator. The term "labor dispute" shall be broadly construed and shall include any controversy concerning wages, salaries, hours, working conditions, or benefits including health and welfare, sick leave, insurance or pension or retirement provisions but not limited thereto, and including any controversy concerning any differences or questions that may arise between the parties including but not limited to the making or maintaining of collective bargaining agreements, the terms to be included in such agreements, and the interpretation or application of such collective bargaining agreements and any grievance that may arise and questions concerning representation. Each party shall pay one-half of the expenses of such arbitration.

(emphasis added).

16.    WMATA enjoys the Eleventh Amendment immunity of its constituent jurisdictions. *Beebe v. Washington Metro. Area Transit Auth.*, 129 F.3d 1283, 1287 (D.C. Cir. 1997) ("In signing the WMATA Compact, Maryland, Virginia, and the District of Columbia conferred upon WMATA their respective sovereign immunities.") (internal citation omitted). Section 77 of the WMATA Compact only waives WMATA's immunity for torts "committed in the conduct of any proprietary function," while retaining immunity for torts committed by its agents "in the performance of a governmental function." Compact, § 77; *Beebe*, 129 F.3d at 1287.

17.    WMATA also enjoys immunity from all laws of its constituent jurisdictions, except as explicitly provided in the Compact. *See C.T. Hellmuth & Assocs., Inc. v. Washington Metro. Area Transit. Auth.*, 414 F. Supp. 408, 409 (D. Md. 1976); *Lucero-Nelson v. Washington Metro. Area Transit Auth.*, 1 F. Supp. 2d 1, 7 (D.D.C. 1998) ("[P]ursuant to the WMATA Compact, one signatory may not impose its legislative enactment upon the entity created by it without the express consent of the other signatories and of the Congress of the United States.") (internal citations omitted).

## The Collective Bargaining Agreement

18.     Section 102(b) of the CBA provides: "The legal rights, obligations and responsibilities of the Authority and the Union with regard to collective bargaining and resort to binding interest arbitration are specified in the WMATA Compact." Ex. 1, § 102(b).

19.     Further, in Section 102(b) of the CBA, Local 689 agreed that WMATA expressly reserves "all matters pertaining to the management of operations, including … the hiring and establishment of standards for selection and qualification of employees, … [as] the prerogatives of the Authority . . . unless expressly waived …." *Id*.

20.     The CBA provides the following with respect to inclusion of new employees in the Local 689 bargaining unit:

**Sec. 103 - Union Shop and Checkoff**

(a) On and after the thirtieth day following the effective date of this contract, all of the employees of the Authority included in the bargaining unit as defined in Section 102 hereof shall become and remain members in good standing of the Union as a condition precedent to continued employment, and the Union agrees to receive into the membership all such eligible employees according to the laws of the Union. This Section shall become operative as to new employees thirty (30) days from the date of their employment.

Ex. 1, § 103.

21.     Section 104 of the CBA provides, in pertinent part:

**Sec. 104 - Discipline and Grievance Procedure**

(a) Employees (and assisting Union representatives) shall fill out grievance forms to the best of their knowledge and ability. Grievances should be as complete and specific as possible including a statement of the facts involved, the sections of the agreement alleged to have been violated and the remedy sought. Management officials responsible for filing written grievance responses shall do so to the best of their knowledge and ability. Responses shall be as complete and specific as possible including a statement of the facts involved, references to relevant contract language and reasons for the decision.

(b) Grievances shall be processed in the following manner:

* * *

Step 4 - If the Union, through the Business Agent (or the Business Agent's designee), is not satisfied with the Step 3 decision, it may appeal the grievance by requesting a conference with the General Manager (or the General Manager's designee) within ten (10) working days of receipt thereof. The General Manager (or the General Manager's Designee) will hold said conference and issue a written decision within twenty (20) working days of the receipt of the Step 4 grievance or the Step 3 appeal.

Step 5 - If the Union is not satisfied with the Step 4 decision, it may, within sixty (60) calendar days after receipt thereof, invoke arbitration in accordance with Section 105 of this Agreement.

(c) Questions arising under the Agreement may be processed directly by the Union commencing with the matter being reduced to writing and served on the affected Office Director (or the Office Director's designee). Within ten (10) working days of receipt of such written notice, the affected Office Director (or the Office Director's designee) will confer with the Union and issue a written decision on the question within twenty (20) working days of such conference. If the Union is not satisfied with that decision, it may appeal the decision to the General Manager (or the General Manager's designee) and pursue arbitration in accordance with the procedures set forth in Steps 4 and 5 above.

Ex. 1, § 104.

22.     Section 105 of the CBA provides:

**Sec. 105 - Arbitration of Questions and Grievances**

Properly accredited representatives of the Authority shall meet and treat with properly accredited representatives of the Union, on all questions and grievances in accordance with Section 104. Questions or grievances that cannot be amicably adjusted by said conferences shall be submitted to a Board of Arbitration composed of three (3) persons, one (1) to be chosen by the Authority, one (1) to be chosen by the Union, and the two (2) thus selected to select a third disinterested arbitrator; the findings of a majority of said Board of Arbitration to be final and binding. Each of the parties hereto shall name its arbitrator within five (5) days after having received written notice from the other party hereto, and if either party fails to name its arbitrator it shall forfeit its case. If, after a period of ten (10) days from the date of the appointment of the two (2) arbitrators representing the Union and the Authority, the third arbitrator has not been selected, then either arbitrator may request the American Arbitration Association to furnish a list of five (5) persons from which one (1) shall be selected to act as the third arbitrator. The arbitrators appointed by the parties, no later than five (5) days after the receipt of such list, shall determine by lot the order of elimination,

and thereafter each shall in that order alternately eliminate one (1) name until only [*sic*] (1) name remains. The remaining person on the list shall be the third arbitrator. All the conditions in this contract shall remain undisturbed during the arbitration proceedings. Each of the parties hereto shall bear the expense of its own arbitrator and the parties hereto shall jointly bear the expense of the third arbitrator.

Ex. 1, § 105.

23.     Section 101(b) provides:

**Sec. 101 - Purpose of Agreement**

(b) The parties will not discriminate against <u>any employee</u> of the Authority because of race, age, color, religion, sex, sexual orientation or national origin in any manner including upgrading, demotion, transfer, layoff, termination, rate of pay or other forms of compensation or benefits.

Ex. 1, § 101(b) (emphasis added).

24.     Section 101(b) of the CBA does not refer specifically to Title VII, the Civil Rights Act of 1964, as amended, or any other federal, state, or local statute establishing or protecting civil rights or prohibiting discrimination. *See id*.

**WMATA's Criminal Background Screening Policies and Procedures**

25.     WMATA has had criminal background screening policies or procedures applicable to candidates for employment and employees for many years.

26.     In December 2011, WMATA adopted WMATA Policy/Instruction 7.2.3, which WMATA subsequently amended in 2013 to include Appendix F and further amended in 2015 as Policy/Instruction 7.2.3/1 (the "2012 Policy"). The 2012 Policy has been discontinued and no longer is in effect.

27.     In April 2017, WMATA announced a new criminal background screening policy, WMATA Policy/Instruction 7.2.3/2 (the "2017 Screening Policy"). The 2017 Screening Policy became effective on July 10, 2017. The 2017 Screening Policy replaced the 2012 Policy. A true

and correct copy of the 2017 Screening Policy is attached to this Complaint as **Exhibit 2** and

incorporated into this Complaint by reference.

**Litigation over the 2012 Policy**

28.     In July 2014, a challenge to the 2012 Policy under Title VII of the Civil Rights

Act was filed by certain candidates for employment, employees, and/or former employees with

WMATA or certain WMATA contractors as a putative class action. *Little v. WMATA*, Civ. No.

1:14-cv-1298 (RMC) (D.D.C.).

29.     By Order dated March 31, 2017, the Court in *Little v. WMATA* granted in part a

motion for class certification and certified three separate classes of candidates, employees, and

former employees who were denied employment, terminated, or suspended as a result of the

application of Appendix A, C, or F of the 2012 Policy. Mem. Op. & Order dated Mar. 31, 2017,

ECF Nos. 183, 184, *Little v. WMATA*, Civ. No. 1:14-cv-1289 (RMC) (D.D.C.); *Little v.

Washington Metro. Area Transit Auth.*, 249 F. Supp. 3d 394 (D.D.C. 2017).

30.     By Order dated April 27, 2018, the Court in *Little v. WMATA* approved a

settlement of the *Little v. WMATA* litigation. Order dated Apr. 27, 2018, ECF No. 254, *Little v.

WMATA*, Civ. No. 1:14-cv-1289 (RMC); *Little v. Washington Metro. Area Transit Auth.*, No.

CV 14-1289 (RMC), -- F. Supp. 3d --, 2018 WL 1997257 (D.D.C. Apr. 27, 2018). The Court's

approval order requires the parties to comply with the settlement agreement. *Id*. The settlement

agreement obligates WMATA to maintain the 2017 Screening Policy without material change

for a period of one (1) year from the date of the Court's order approving the settlement.

Specifically, the settlement agreement provides:

**5.      WMATA's Settlement Obligations.**

(a)     For a period of one (1) year from the date the Court first issues the order
approving this Settlement Agreement, WMATA will not make any material

change to the 2017 Policy, including no discontinuation of the exclusions in Appendix A, Section 9 of the 2017 Policy, no discontinuation or material modification of the individualized assessment procedure or curtailing of the candidate's rights in Appendix C of the 2017 Policy, and no additions of offenses or lengthening the time periods resulting in automatic disqualification beyond the offenses listed in Appendix A, Section 4 of the 2017 Policy. . . . . It is understood and agreed that WMATA's obligation under this paragraph runs from the date the District Court first issues the order approving the Settlement Agreement, and not from the Effective Date, regardless of when the Effective Date may occur.

Settlement Agreement, ECF No. 240-2 at 15-16, *Little v. WMATA*, Civ. No. 1:14-cv-1289 (RMC) (D.D.C.).

31.     The Court's Order approving the *Little v. WMATA* settlement is on appeal to the Court of Appeals for the District of Columbia Circuit. *Erick Little, et al. v. WMATA, et al.*, 18-7071 (D.C. Cir.).

32.     During the pendency of the *Little v. WMATA* litigation, on or about April 10, 2015, in response to Local 689's attempts to arbitrate grievances alleging discriminatory effects of the 2012 Policy, WMATA filed suit against Local 689. WMATA sought, among other things, a temporary restraining order and injunction against the arbitrations of two grievances challenging WMATA's 2012 Policy as discriminatory. *WMATA v. Local 689*, Case No. 1:15-cv-536 (RMC) (D.D.C.).

33.     The two grievances initially at issue in *WMATA v. Local 689* were: (A) Grievance No. 9406, filed on May 30, 2014 by Gerry Garnett "on behalf of Bus Operators, maintenance workers, and clerical employees at the Northern Division[;]"and (B) Grievance No. 9407, filed on May 30, 2014 by Gerry Garnett "on behalf of all employees at the Northern Division and any other Division that has Bus personnel employed" (collectively, the "2014 Grievances"). True and correct copies of the 2014 Grievances are attached to this Complaint as **Exhibit 3** and are

incorporated into this Complaint by reference. The 2014 Grievances did not identify a single employee affected by the allegedly discriminatory 2012 Policy.

34.     The CBA does not permit these types of grievances, nor any grievance that fails to name and include the signatures of the individual(s) filing the grievance. Ex. 1.

35.     The Court granted WMATA's request for a temporary restraining order on May 11, 2015. Order dated May 11, 2015, ECF No. 11, *WMATA v. Local 689*, Case No. 1:15-cv-536 (RMC) (D.D.C.).

36.     Subsequently, on June 29, 2015, the Court in *WMATA v. Local 689* entered its Memorandum Opinion and Order granting WMATA's request for a preliminary injunction and preliminarily enjoining the arbitrations on the 2014 Grievances. Mem. Op. & Order dated June 29, 2015, ECF Nos. 18, 19, *WMATA v. Local 689*, Case No. 1:15-cv-536 (RMC) (D.D.C.); *WMATA v. Local 689*, 113 F. Supp. 3d 121.

37.     Then, on July 14, 2015, this Court permanently enjoined "Local 689 and all persons acting on behalf of or in concert with Local 689" from arbitrating the 2014 Grievances. Order dated July 14, 2015, ECF No. 21, *WMATA v. Local 689*, Case No. 1:15-cv-536 (RMC) (D.D.C.).

38.     Local 689 appealed the Court's July 14 Order to the Court of Appeals for the District of Columbia Circuit. *WMATA v. Amalgamated Transit Union, Local 689*, 15-7078 (D.C. Cir.). The Court of Appeals affirmed the Court's July 14 Order on March 11, 2016. *Id.*

39.     Not to be deterred, on or about March 21, 2016, Local 689 initiated a "question" grievance objecting to the 2012 Policy as allegedly discriminatory in application against African-Americans (the "2016 Grievance"). The 2016 Grievance sought to require WMATA to cease using or revise the 2012 Policy so as to stop alleged discrimination on the basis of race. A true

and correct copy of the 2016 Grievance is attached to this Complaint as **Exhibit 4** and is incorporated into this Complaint by reference.

40.     On or about September 7, 2016, WMATA moved to reopen *WMATA v. Local 689* and enjoin Local 689's efforts to circumvent the Court's July 14 Order. Mtn. to Reopen, ECF No. 26, *WMATA v. Local 689*, Case No. 1:15-cv-536 (RMC) (D.D.C.).

41.     In December 2016, WMATA and Local 689 entered into an agreement pursuant to which Local 689 withdrew the demand for arbitration of the 2016 Grievance and WMATA withdrew its pending motion to enjoin Local 689's efforts to pursue and arbitrate the 2016 Grievance. The parties agreed that the withdrawals of the arbitration demand and the pending motions would "remain in effect pending and until the final resolution of *Little v. WMATA*, whether by final decision, including any appeal, or by settlement, withdrawal, or other voluntary means." A true and correct copy of the December 2016 agreement is attached to this Complaint as **Exhibit 5** and is incorporated into this Complaint by reference.

42.     In addition, in the December 2016 agreement, Local 689 agreed:

5. Local 689 further agrees that it will not raise or attempt to bring any other or further disputes claiming, or demands for arbitration seeking relief or other determination alleging, claiming, or otherwise associated with, discrimination on the basis of race arising out of or under WMATA's criminal background check policies since 2011 (A) based on theories or claims of disparate impact or (B) on behalf of groups or classes of persons.

Ex. 5.

43.     Following Court approval of the settlement in *Little v. WMATA*, counsel for Local 689 sent to WMATA a letter seeking to revive the 2016 Grievance and 2014 Grievances. A true and correct copy of the Local 689 Revival Letter is attached to this Complaint as **Exhibit 6** and is incorporated into this Complaint by reference.

44.     WMATA responded to the Local 689 Revival Letter by denying the Union's requests and demanding that the Union withdraw the pending grievances and the demands for arbitration. A true and correct copy of WMATA's written response to the Local 689 Revival Letter is attached to this Complaint as **Exhibit 7** and is incorporated into this Complaint by reference.

45.     Counsel for Local 689 disregarded the demand to withdraw the grievances and requests to arbitrate and instead indicated an intention to proceed with the grievances and arbitration as scheduled. A true and correct copy of Local 689's response to WMATA's letter is attached to this Complaint as **Exhibit 8** and is incorporated into this Complaint by reference.

### The 2017 Grievance

46.     Local 689 also has sought to challenge the 2017 Screening Policy. By letter dated May 19, 2017, Local 689 President and Business Agent Jackie Jeter submitted a question grievance under Section 104 of the Collective Bargaining Agreement objecting to the 2017 Screening Policy (the "2017 Grievance"). A true and correct copy of the 2017 Grievance is attached to this Complaint as **Exhibit 9** and is incorporated into this Complaint by reference.

47.     The 2017 Grievance purports to grieve aspects of WMATA's 2017 Screening Policy. In particular, the 2017 Grievance purports to raise issues regarding the alleged discriminatory impact of the 2017 Screening Policy:

A.     The 2017 Grievance claims that WMATA's 2017 Screening Policy is "discriminatory in thought, and application, to the employed population." Ex. 9.

B.     The 2017 Grievance asserts that the 2017 Screening Policy "definitely raises the issues [sic] of the treatment of new hires. They will be subjected to the scrutiny of a person suspected of criminal behavior." *Id.*

C.     The 2017 Grievance claims: "New employees being forced to sign an agreement that would have them surrender to random checks is extreme and leaves the door wide open for discriminatory treatment towards a certain race, or class of people." *Id*.

D.     The 2017 Grievance asserts: "The same applies to the random testing of current employees who have not given or displayed any criminal activity that would solidify that treatment but will be subjected to discriminatory criminal background checks because of racial profiling and the historically foul treatment of a race of people, although no reason has been given." *Id*.

48.     The 2017 Grievance purportedly raises issues regarding WMATA's adoption and implementation of the 2017 Screening Policy:

A.     The 2017 Grievance claims that WMATA "failed to negotiate with Local 689" over the 2017 Screening Policy. *Id*.

B.     The 2017 Grievance asserts that the 2017 Screening Policy's "point system is determined by a person . . . that hasn't been agreed upon or chosen by both parties." *Id*.

C.     The 2017 Grievance asserts that the 2017 Screening Policy's appeal process "only gives management the authority to decide whether the person should be disqualified" and that WMATA's unions "should have a representative on the panel." *Id*.

D.     The 2017 Grievance claims that the "procedure on its face gives little redress for the contractual grievance procedure to occur" and "[l]anguage should be written into the policy for the grievance procedure to redress any issues that arise because of the 4 unions representing those employees." *Id*.

E.     The 2017 Grievance also asserts that there are "questions arising from the implied change of the contractor company 1st Choice." *Id*.

49.    CBA Section 101(b) provides (emphasis added): "The parties will not discriminate against <u>any</u> <u>employee</u> of the Authority because of race …." Ex. 1, § 101(b). Contrary to CBA Section 101(b), the 2017 Grievance does not allege that WMATA discriminated on the basis of race against <u>an employee</u>. Contrary to CBA Section 101(b), the 2017 Grievance does not reference, in any respect, any employee against whom WMATA allegedly discriminated on the basis of race or who was allegedly harmed as a result of alleged discrimination on the basis of race.

50.    The 2017 Grievance does not identify or otherwise purport to be on behalf of an aggrieved "employee" who is a Local 689 bargaining unit member. The 2017 Grievance does not identify an actual injury or imminent threat of actual injury.

51.    The 2017 Grievance challenges the 2017 Screening Policy provision relating to random screening of employees, but no random screening has been conducted to date, no employee of WMATA has been terminated, suspended, or other adversely affected by the random screening provisions of the 2017 Screening Policy, and no new WMATA employee has been required to agree to a random criminal background checks.

52.    On or about July 18, 2017, WMATA met with Local 689 representatives to discuss the 2017 Grievance.

53.    On or about August 2, 2017, Local 689 unilaterally invoked arbitration of the 2017 Grievance, notwithstanding WMATA's position on arbitrability communicated at the July 18 meeting.

54.    On or about August 15, 2017, WMATA issued its written decision on the 2017 Grievance. A true and correct copy of WMATA's Step 4 Answer on the 2017 Grievance is attached to this Complaint as **Exhibit 10** and is incorporated into this Complaint by reference.

55.     The Union insisted on setting the 2017 Grievance for arbitration over WMATA's objection. Initially, the Union indicated that it could not and would not challenge the discriminatory impact of the background testing policy in arbitration because the Union had agreed not to do so pending resolution of *Little v. WMATA. See* **Exhibit 11**, which is a true and correct copy of an email exchange between Gayle Gray of WMATA and Douglas Taylor, counsel to Local 689, and is incorporated into this Complaint by reference. Then, in Local 689 Revival Letter, the Union proposed to consolidate the arbitrations on the 2017 Grievance, 2016 Grievance, and 2014 Grievances in an apparent attempt to raise once more claims of alleged discrimination as to the discontinued 2012 Policy and the 2017 Policy. Ex. 6. The arbitration for the 2017 Grievance is set on June 19, 2018.

56.     The 2017 Grievance is not arbitrable. Pursuant to the Compact, WMATA cannot be compelled to arbitrate, Local 689 does not have the right to engage WMATA in an arbitration, and an arbitrator does not have the power or right to hear or to decide a purported grievance on behalf of a person, if there be one, who is not a WMATA employee and member of the Local 689 bargaining unit.

57.     Regardless of whether or not a person, at some time in the future, may be a WMATA employee and member of the bargaining unit, there is not, and there cannot be, a lawful arbitration by or on behalf of any person who is not a WMATA employee, regardless of whether Local 689 or another entity or person attempts to bring such an arbitration.

58.     The Compact does not authorize a purported grievance without naming, and not on behalf of, an actual, affected WMATA employee.

59. The Compact does not authorize arbitration on behalf of persons, if any, who are unnamed and who might not exist. The Compact does not authorize arbitration of a purported grievance without naming, and not on behalf of, an actual, affected WMATA employee.

60. The 2017 Grievance does not name, and is not brought on behalf of, any actual, affected WMATA employee who is a member of Local 689. *See* Ex. 9.

61. The 2017 Grievance claims discrimination "in thought, and application, to the *employed population*" (emphasis added) and alleges "discriminatory treatment towards a certain race, or class of people." It further claims that screening under the 2017 Screening Policy will subject current employees to alleged "discriminatory criminal background checks because of racial profiling and the historically foul treatment of a race of people, although no reason has been given." The 2017 Grievance raises Title VII-type claims, encompassing on its face claims of alleged disparate impact and discriminatory treatment, as to "new hires," "new employees," "current employees," and the "employed population" as a whole. Ex. 9.

62. The CBA does not identify (a) the Civil Rights Act of 1964 or (b) any part of the Civil Rights Act of 1964, including Title VII, as subject to (x) a CBA grievance, (y) the CBA grievance procedures, or (z) arbitration under the CBA. *See* Ex. 1.

63. The CBA reserves "all matters pertaining to the hiring and establishment of standards for selection and qualification of employees, … [as] the prerogatives of the Authority . . ." Ex. 1, § 102(b).

64. WMATA has demanded that Local 689 cease and desist from pursuing arbitration of the 2017 Grievance.

65. Local 689 is insistent on proceeding with the arbitration, despite previous orders of this Court directly relating to this issue.

66.     In addition, Local 689 seeks to consolidate the 2014 Grievances and the 2016 Grievance on the 2012 Policy with the 2017 Grievance on the 2017 Screening Policy in a single proceeding before the arbitration board that is set to hear the 2017 Grievance. *See* Ex. 6.

67.     WMATA has refused to consent to the Union's proposed consolidation of the arbitrations of the various grievances. Ex. 7.

### Grounds for Relief

### The 2017 Grievance Is Not Arbitrable

**A.      The 2017 Grievance is not brought by, or on behalf of, a current WMATA employee who is a Local 689 bargaining unit member allegedly adversely affected by the 2017 Screening Policy.**

68.     The 2017 Grievance is not arbitrable because it is not brought by, for, or on behalf of a WMATA employee who is a Local 689 bargaining unit member. Rather, the 2017 Grievance purports to raise issues on behalf of the "employed population[,]" "new hires[,]" and "[n]ew employees." Further, the 2017 Grievance seeks to implement changes to the 2017 Screening Policy that would impact how WMATA conducts individualized assessment reviews for candidates for employment and employees, including the composition of the review panel for individualized assessment appeals under the 2017 Screening Policy.

69.     The Compact mandates arbitration only of labor disputes "involving" an employee. *WMATA v. Local 689*, 113 F. Supp. 3d at 127 (Compact "requires a dispute 'involving' some employee").

70.     The 2017 Grievance does not identify any WMATA employee who is a Local 689 bargaining unit member who has suffered an adverse impact as a direct result of the 2017 Screening Policy. *Id.* (WMATA demonstrated likelihood of success on the merits of its claim that grievances which fail to name any affected employees are not subject to arbitration because

Union could not identify any employee who suffered an adverse consequence from the policy that was disputed).

71.     Absent an identifiable, affected WMATA employee who is a Local 689 bargaining unit member:

A.     The Compact does not mandate arbitration of, and WMATA cannot be compelled to arbitrate, the 2017 Grievance.

B.     Local 689 has no authority to bring, is powerless to bring, and has no right to bring, an arbitration against WMATA with respect to the 2017 Grievance.

C.     An "arbitrator" has no authority to conduct and may not conduct an arbitration with respect to the 2017 Grievance.

72.     Further, the 2017 Grievance purports to seek changes to provisions and procedures of the 2017 Screening Policy that are applied to candidates for employment and "new hires" as well as employees. Ex. 9.

73.     Candidates for employment are not employees within the meaning of Compact Section 66. And prior to the time a "new hire" becomes a bargaining unit member of Local 689, a "new hire" is not a member of the Local 689 bargaining unit and is not represented by, or a member of, Local 689. *See* Ex. 1, § 103(a). Therefore:

A.     A candidate for employment and/or future bargaining unit member is powerless to bring, and has no right to bring, a "grievance" against WMATA.

B.     Local 689 is powerless to bring, and has no right to bring, a "grievance" against WMATA for or on behalf of a candidate for employment and/or future bargaining unit member.

C.      A candidate for employment and/or future bargaining unit member is powerless to bring, and has no right to bring, an arbitration against WMATA pursuant to the CBA.

D.      Local 689 is powerless to bring, and has no right to bring, an arbitration against WMATA for or on behalf of a candidate for employment and/or future bargaining unit member.

E.      WMATA is powerless to arbitrate, is not obligated to arbitrate, and cannot be compelled to arbitrate a "grievance" brought by Local 689 for or on behalf of a candidate for employment and/or future bargaining unit member.

F.      An "arbitrator" is powerless to conduct, and may not conduct, an arbitration by, for, or on behalf of a candidate for employment and/or future bargaining unit member.

**B.      The 2017 Grievance seeks to arbitrate a statutory disparate-impact challenge to the 2017 Screening Policy.**

74.     Disparate impact claims are exclusively statutory, creations of Title VII, 42 U.S.C.A. § 2000e–2(k). A disparate impact claim is based on the Congressionally-established, statutory premise and presumption that there may be an employment practice, neutral on its face and/or adopted without discriminatory intent, that has a disparate impact on the basis of race of such a nature that Congress determined it could be the statutory equivalent of intentional discrimination. Congress decreed the elements of and burdens of proof and persuasion for a claim of disparate impact in 42 U.S.C.A. § 2000e–2(k).

75.     Before Congress enacted 42 U.S.C.A. § 2000e–2(k), the concept of actionable "disparate impact" on the basis of race existed only as a method the United States Supreme Court had developed for proving intentional discrimination under the Civil Rights Act of 1861 and

Title VII of the Civil Rights Act of 1964. Following the Supreme Court's development of disparate impact as a method of proving intentional discrimination under the federal Civil Rights Acts, other courts, federal and state, cited, relied on, and/or adopted the Supreme Court's development of disparate impact as a method of proving intentional discrimination under the federal Civil Rights Acts as a method of proving intentional discrimination under other statutes prohibiting intentional discrimination. The disparate impact standard now has been codified under, and is a specific creature of statute that is part of, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e–2(k).

76.     Other than as codified in 42 U.S.C.A. § 2000e–2(k), a claim of racial discrimination based on the alleged disparate impact on the basis of race of a policy or practice exists only as a method of proof to meet the elements of an intentional discrimination claim under a particular statute. Disparate impact of a policy or practice on the basis of race does not exist *sui generis* or otherwise standing alone as actionable discrimination or grounds for a claim of discrimination on the basis of race.

77.     Title VII expressly creates a statutory claim of discrimination based on disparate impact. Other than Title VII, a claim of intentional discrimination first must arise under a particular statute before alleged disparate impact of a policy or practice on the basis of race is recognized as an acceptable method of proof under particular statutes prohibiting discrimination. A claim of alleged disparate impact of a policy or practice on the basis of race is solely a matter of statute or statutory construction. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 429 (1970); *Croker v. Boeing Co.*, 662 F.2d 975, 989 (3d Cir. 1981) (*aff'ing*, in relevant and material respect, 437 F. Supp. 1138 (E.D. Pa. 1977)); *Estenos v. PAHO/WHO Federal Credit Union*, 952 A.2d 878, 887 (D.C. 2008); *Douglas v. Kriegsfeld Corp.*, 884 A.2d 1109, 1128 (D.C. 2005); *Haas v.*

*Lockheed Martin Corp.*, 396 Md. 469, 483 n.8, 914 A.2d 735, 743 n.8 (2007); *Best Medical Intern., Inc. v. Wells Fargo Inc. NA*, 82 Va. Cir. 502, 2011 WL 7478299 (Va. Cir. Ct. Apr. 27, 2011); *Ojo v. Farmers Group, Inc.*, 356 S.W. 3d 421, 427-28 (Tex. 2011); *Galante v. Sandoz, Inc.*, 196 N.J. Super. 568, 570-71, 483 A.2d 829, 830 (1984); *Milwaukee and Suburban Transport Corp. v. Wisconsin Dep't of Ind.*, 1973 WL 2711, at *2-5 (Wis. Cir. Dec. 21, 1973).

78.     WMATA is not subject to state laws prohibiting discrimination in employment on the basis of race. *Taylor v. Washington Metro. Area Transit Auth.*, 109 F. Supp. 2d 11, 18 (D.D.C. 2000) ("It is well-established that WMATA is not subject to the DCHRA because WMATA is an interstate compact agency and instrumentality of three separate jurisdictions."); *see Lucero–Nelson v. WMATA,* 1 F. Supp. 2d 1, 7 (D.D.C. 1998) (dismissing DCHRA claims of sexual harassment, national origin discrimination, and hostile working environment).

79.     For statutory claims of discrimination to be arbitrable, and as a necessary legal precondition to WMATA being subject to arbitration of statutory claims of discrimination, a collective bargaining agreement's agreement to arbitrate must identify specifically the particular statute under which the claim arises and that furnishes a basis for relief. *See 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 274 (2009); *Ibarra v. UPS*, 695 F.3d 354, 358-60 (5th Cir. 2012).

80.     The CBA does not identify Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., in any respect, even generally. Particularly, the CBA does not identify Title VII or Section 2000e-2(k) regarding claims of disparate impact. Ex. 1.

81.     General prohibitions on discrimination and promises not to discriminate in a collective bargaining agreement, like Section 101(b) of the CBA, do not satisfy the requirement of the specific identification of statutes.

82.     General prohibitions on discrimination and promises not to discriminate in a collective bargaining agreement, like Section 101(b) of the CBA, cannot make arbitrable the solely statutory, non-arbitrable, disparate impact claims of the 2017 Grievance. *See Ibarra*, 695 F.3d at 358-60.

83.     The 2017 Grievance's assertions that WMATA's 2017 Screening Policy is allegedly "discriminatory in thought, and application, to the employed population[,]" "leaves the door wide open for discriminatory treatment towards a certain race, or class of people[,]" and allegedly subjects current employees to "discriminatory criminal background checks because of racial profiling and the historically foul treatment of a race of people," allege disparate impact discrimination and/or other statutory discrimination on the basis of race. Thus, these claims are not arbitrable.

**C.     The 2017 Grievance is premature.**

84.     In addition to the foregoing, the 2017 Grievance is not arbitrable because it is premature.

85.     The 2017 Grievance seeks to arbitrate the alleged discriminatory impact of the 2017 Screening Policy's random screening procedures. It states in part:

A.      "New employees being forced to sign an agreement that would have them surrender to random checks is extreme and leaves the door wide open for discriminatory treatment towards a certain race, or class of people." Ex. 9.

B.       "The same applies to the random testing of current employees who have not given or displayed any criminal activity that would solidify that treatment but will be subjected to discriminatory criminal background checks because of racial profiling and the historically foul treatment of a race of people, although no reason has been given." *Id.*

86.     WMATA has not instituted the random check provision for WMATA employees.

87.     WMATA has not required new employees hired into Local 689 represented positions to agree to random criminal background checks.

**D.     The 2017 Grievance concerns matters within the non-arbitrable realm of WMATA's management and operations and/or matters for which the Union has waived negotiation and arbitration.**

88.     In addition, the 2017 Grievance is not arbitrable because it seeks to insert the Union in matters pertaining to the hiring and establishment of standards for selection and qualification of employees, which matters are not subject to negotiation, or arbitration, by the Union.

89.     The CBA provides: "The Union acknowledges that all matters pertaining to the management of operations, including . . . the hiring and establishment of standards for the selection and qualification of employees . . . are the prerogatives of the Authority and are reserved by the Authority unless expressly waived by specific provisions of this agreement, or by the past practices of the parties." Ex. 1, § 102(b).

90.     The 2017 Screening Policy establishes standards for the selection and qualification of WMATA employees at the time of hire and during the course of an individual's employment.

91.     WMATA has not waived its right to establish employment qualification standards in the CBA.

92.     WMATA has not waived its right to establish employment qualification standards concerning an individual's criminal conviction history in the CBA.

93.     WMATA has exercised its right to establish employment qualification standards concerning an individual's criminal conviction history and has not waived the same by prior practice or otherwise.

A.     WMATA has exercised its right to set employment qualification standards regarding an individual's criminal conviction history for many years.

B.     WMATA has exercised its right to set employment qualification standards regarding an individual's criminal conviction history by unilaterally issuing and revising on multiple occasions criminal background screening policies and procedures, all without engaging in negotiations.

**E.     The 2017 Grievance is barred by the Court-approved settlement agreement in *Little v. WMATA*.**

94.     In addition to the foregoing, the 2017 Grievance seeks to cause WMATA to change the 2017 Screening Policy.

95.     Changing the 2017 Screening Policy would violate the terms of the Court's Order in *Little v. WMATA*, which precludes any material change to the 2017 Screening Policy until April 27, 2019.

**F.     The 2017 Grievance is barred by the parties' agreement in *WMATA v. Local 689*.**

96.     In addition to the foregoing, the 2017 Grievance is barred by the parties' December 2016 agreement.

97.     The December 2016 agreement states:

5. Local 689 further agrees that it will not raise or attempt to bring any other or further disputes claiming, or demands for arbitration seeking relief or other determination alleging, claiming, or otherwise associated with, discrimination on the basis of race arising out of or under WMATA's criminal background check policies since 2011 (A) based on theories or claims of disparate impact or (B) on behalf of groups or classes of persons.

Ex. 5.

98.     The 2017 Grievance raises a dispute alleging, claiming, or otherwise associated with, discrimination on the basis of race arising out of WMATA's criminal background check policies since 2011 based on theories or claims of "alleged" disparate impact.

99.     The 2017 Grievance raises a dispute alleging, claiming, or otherwise associated with, discrimination on the basis of race arising out of WMATA's criminal background check policies since 2011 on behalf of groups or classes of persons.

100.    Local 689 seeks arbitration to obtain relief or other determination of Local 689's claim that WMATA's criminal background check policies since 2011 discriminate on the basis of race based on theories or claims of "alleged" disparate impact.

101.    Local 689 seeks arbitration to obtain relief or other determination of Local 689's claim that WMATA's criminal background check policies since 2011 discriminate against certain groups or classes of persons.

### The 2014 Grievances Are Not Arbitrable

102.    The 2014 Grievances are not arbitrable because this Court permanently enjoined the arbitrations of the grievances by final order in *WMATA v. Local 689*. Order dated July 14, 2015, *WMATA v. Local 689*, ECF No. 21, Civ. No. 1:15-cv-536 (RMC) (D.D.C.).

103.    In addition, the 2014 Grievances are not arbitrable for all of the reasons stated in WMATA's Amended Complaint and subsequent filings in *WMATA v. Local 689*.

104.    In addition, the 2014 Grievances are barred by the class-action settlement agreement in *Little v. WMATA* and the Court's order approving the settlement.

## The 2016 Grievance Is Not Arbitrable

**A.**     **The 2016 Grievance is not brought by, or on behalf of, a current WMATA employee who is Local 689 bargaining unit member allegedly adversely affected by the 2012 Policy.**

105.     The 2016 Grievance is not arbitrable because it is not by, for, or on behalf of a WMATA employee who is a Local 689 bargaining unit member. Rather, the 2016 Grievance purports to raise issues on behalf of "African Americans" and "Local 689 bargaining unit members" generally. Ex. 4.

106.     The Compact mandates arbitration only of labor disputes "involving" an employee. *WMATA v. Local 689*, 113 F. Supp. 3d at 127 (Compact "requires a dispute 'involving' some employee").

107.     The 2016 Grievance does not identify any WMATA employee who is a Local 689 bargaining unit member who has suffered an adverse impact as a direct result of the 2012 Policy. *Id.* (WMATA demonstrated likelihood of success on the merits of its claim that grievances which fail to name any affected employees are not subject to arbitration because Union could not identify any employee who suffered an adverse consequence from the policy that was disputed).

108.     Absent an identifiable, affected WMATA employee who is a Local 689 bargaining unit member:

A.     The Compact does not mandate arbitration of, and WMATA cannot be compelled to arbitrate, the 2016 Grievance.

B.     Local 689 has no authority to bring, is powerless to bring, and has no right to bring an arbitration against WMATA with respect to the 2016 Grievance.

C.     An "arbitrator" has no authority to conduct and may not conduct an arbitration with respect to the 2016 Grievance.

**B.      The 2016 Grievance seeks to arbitrate a statutory disparate-impact challenge to the 2017 Screening Policy.**

109.    Disparate impact claims are solely matters of statute or statutory construction and are not arbitrable unless a collective bargaining agreement's agreement to arbitrate identifies specifically the particular statute under which the claim arises and furnishes a basis for relief, for the reasons stated in paragraphs 74 through 79 above, which paragraphs WMATA incorporates in the paragraph 109 as if fully set forth herein.

110.    The CBA does not identify Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., in any respect, even generally. Particularly, the CBA does not identify Title VII or Section 2000e-2(k) regarding claims of disparate impact. Ex. 1.

111.    General prohibitions on discrimination and promises not to discriminate in a collective bargaining agreement, like Section 101(b) of the CBA, do not satisfy the requirement of the specific identification of statutes.

112.    General prohibitions on discrimination and promises not to discriminate in a collective bargaining agreement, like Section 101(b) of the CBA, cannot make arbitrable the solely statutory, non-arbitrable, disparate impact claims of the 2016 Grievance. *See Ibarra*, 695 F.3d at 358-60.

113.    The 2016 Grievance's claim that WMATA's 2012 Policy is allegedly "discriminatory in application against African Americans" alleges disparate impact discrimination or other statutory discrimination on the basis of race. As such, the 2016 Grievance is not arbitrable.

**C.      The 2016 Grievance concerns matters within the non-arbitrable realm of WMATA's management and operations and/or matters for which the Union has waived negotiation and arbitration.**

114.    In addition, the 2016 Grievance is not arbitrable because it seeks to insert the Union in matters pertaining to the hiring and establishment of standards for selection and qualification of employees.

115.    The CBA provides: "The Union acknowledges that all matters pertaining to the management of operations, including . . . the hiring and establishment of standards for the selection and qualification of employees . . . are the prerogatives of the Authority and are reserved by the Authority unless expressly waived by specific provisions of this agreement, or by the past practices of the parties." Ex. 1, § 102(b).

116.    The 2012 Policy established standards for the selection and qualification of WMATA employees at the time of hire and during the course of an individual's employment.

117.    WMATA has not waived its right to establish employment qualification standards in the CBA.

118.    WMATA has not waived its right to establish employment qualification standards concerning an individual's criminal conviction history in the CBA.

119.    WMATA has exercised its right to establish employment qualification standards concerning an individual's criminal conviction history and has not waived the same by prior practice or otherwise.

A.    WMATA has exercised its right to set employment qualification standards regarding an individual's criminal conviction history for many years.

B.    WMATA has exercised its right to set employment qualification standards regarding an individual's criminal conviction history by unilaterally issuing and revising on multiple occasions criminal background screening policies and procedures, all without engaging in negotiations.

**D.    Local 689's attempt to resurrect and pursue the 2016 Grievance violates the parties' December 2016 agreement.**

120.    In addition to the foregoing, Local 689's attempt to resurrect and pursue the 2016 Grievance violates the parties' December 2016 agreement.

121.    The December 2016 agreement states:

4. To conserve the parties' and the Court's resources, Local 689 shall withdraw the request for arbitration that is the subject of WMATA's pending motions in *WMATA v. Local 689* such that there is no need for WMATA to pursue the motions at this time. Upon Local 689's withdrawal of the request for arbitration, WMATA will withdraw the pending motions. Local 689's withdrawal of the arbitration demand and WMATA's withdrawal of the pending motions against Local 689's demand for arbitration and the underlying grievance shall remain in effect pending and until the final resolution of *Little v. WMATA*, whether by final decision, including any appeal, or by settlement, withdrawal, or other voluntary means.

Ex. 5.

122.    The Court entered a final order approving the settlement in *Little v. WMATA* on April 27, 2018. Order dated Apr. 27, 2018, ECF No. 254 at ¶ 7, *Little v. WMATA*, Civ. No. 1:14-cv-1289 (RMC). That Order is on appeal to the Court of Appeals for the District of Columbia Circuit. *Erick Little, et al. v. WMATA, et al.*, 18-7071 (D.C. Cir.).

123.    The *Little v. WMATA* has not been finally resolved.

124.    Local 689's demand for arbitration of the 2016 Grievance violates the parties' December 2016 agreement.

**WMATA Will Suffer Irreparable Harm Absent An Injunction
(And, If Necessary, A Temporary Restraining Order)**

125.    WMATA is immune from the Federal Arbitration Act and from the local arbitration statutes of the District of Columbia, Maryland, and Virginia. The Federal Arbitration Act and the local arbitration statutes of the District of Columbia, Maryland, and Virginia do not

apply to or in any way bind WMATA. The federal and local arbitration statutes and do not authorize or in any way apply to arbitrations of Local 689's grievances.

126.     There are no written, agreed-on, set, established, or otherwise certain procedures for Local 689's arbitrations. In contrast, the Federal Rules of Civil Procedure, augmented by judicial decisions, provide established, set procedures for claims based on an alleged disparate impact.

127.     There are no written, agreed-on, set, established, or otherwise certain rights and protections for WMATA in the Local 689 arbitrations. In contrast, the Federal Rules of Civil Procedure, augmented by judicial decisions, United States statutes, and the United States Constitution provide established, set rights and protections for WMATA with respect to claims based on an alleged disparate impact.

128.     There are no rights or allowances for compelling, and arbitrators do not have the power or authority to compel, the appearance of witnesses or the production of documents, by subpoena or otherwise.

129.     If the arbitration on the 2017 Grievance proceeds, WMATA will be denied its procedural and substantive rights to litigate any disputes arising under and regarding WMATA's 2017 Screening Policy.

130.     If the arbitration on the 2017 Grievance proceeds, WMATA potentially will be subject to multiple, inconsistent determinations on disputes alleging discrimination arising under and regarding WMATA's 2017 Screening Policy.

131.     If the arbitrations on the 2014 Grievances and 2016 Grievance proceed, WMATA potentially will be subject to multiple, inconsistent determinations on disputes alleging discrimination arising under and regarding WMATA's 2012 Policy.

132.    If the arbitrations on the 2014 Grievances and 2016 Grievance proceed, WMATA will be denied its rights to the dismissal of claims under the *Little v. WMATA* settlement.

133.    Any nature of relief that Local 689 may obtain as a result of the arbitrations creates immediate and longer-term irreparable harm to WMATA, to the traveling public, to the jurisdictions that must fund WMATA, and to the employees themselves:

A.    Local 689 could seek to bar WMATA from criminal background screening of current employees altogether and seek to force WMATA to employ convicted criminals. Worse, Local 689 could seek to force WMATA to employ convicted criminals regardless of the nature and heinousness of the offenses for which they were convicted. For example, and not by way of limitation, the arbitrations could seek to force WMATA to forgo monitoring of and retain in employment persons convicted of, for example and not by way of limitation, crimes of violence, crimes with weapons, assaults including sexual assaults generally and sexual assaults on children particularly, and crimes of moral turpitude.

B.    In the arbitrations, Local 689 could seek relief that will force the public, including but not limited to D.C. public school students, to travel on WMATA buses and rail cars operated by convicted criminals.

C.    In the arbitrations, Local 689 could seek relief that will force all the communities that WMATA serves to allow convicted criminals ready access into every community that WMATA serves.

D.    In the arbitrations, Local 689 could seek relief that will endanger people and property and implant fear into public transit.

E.      In the arbitrations, Local 689 could seek relief that will nurture criminal behavior by removing an incentive for WMATA employees to obey the law.

F.      In the arbitrations, Local 689 could seek relief that will penalize persons who obey the law and put law-abiding persons in the same employment status as persons convicted of serious criminality and repeated criminality.

G.      WMATA will spend considerable time, effort, and expense to prepare for and defend the arbitrations at a time when WMATA must work to minimize unnecessary expenses.

H.      Arbitration is a narrow, unfit, and unfitting forum for such society-wide, expansive, and dangerous consequences.

I.      The arbitrations will irreparably harm WMATA by forcing WMATA into arbitrations that the Compact does not authorize. See *WMATA v. Local 689*, 113 F. Supp. 3d at 128.

J.      The arbitrations will irreparably harm WMATA by forcing WMATA into arbitration of issues that neither the Compact nor the CBA compel WMATA to arbitrate.

K.      The arbitrations will irreparably harm WMATA by forcing WMATA into arbitration of issues concerning persons that are not WMATA employees who are Local 689 bargaining unit members.

L.      The arbitrations will irreparably harm WMATA by forcing WMATA into arbitrations into which WMATA cannot be compelled and to which WMATA never agreed.

M.     The arbitrations will irreparably harm WMATA by forcing WMATA into arbitration of issues that WMATA never agreed to arbitrate and that WMATA cannot be compelled to arbitrate.

N.     The arbitrations risk irreparable harm to WMATA and the public to the extent that the arbitrations have binding consequences of wider application and applicability such as collateral estoppel and *res judicata*.

O.     The arbitrations risk irreparable harm to WMATA because they threaten a primary tenet of the class action settlement agreement in *Little v WMATA*.

134.    WMATA faces the foregoing and other imminent and irreparable procedural and substantive harm absent a temporary restraining order and preliminary and permanent injunctive relief stopping the arbitrations.

135.    Persons who are not WMATA employees, if any, on behalf of whom Local 689 may be proceeding in the arbitrations cannot be harmed by restraining and enjoining the arbitrations. These persons, if any, and Local 689, have no right to any arbitrations.

136.    WMATA employees, if any, on behalf of whom Local 689 may be proceeding in the arbitrations will not be harmed by restraining and enjoining the arbitrations. To the contrary:

A.     Restraining and enjoining the 2017 Grievance arbitration will accord WMATA employees, if any, on behalf of whom Local 689 may be proceeding the same procedures, rights, and protections that the Federal Rules of Civil Procedure, augmented by judicial decisions, United States statutes, and the United States Constitution accord WMATA, in the event such persons seek to challenge WMATA's 2017 Screening Policy under Title VII in court;

B. In the event that a WMATA employee is adversely affected by WMATA's 2017 Screening Policy, injunctive relief would not impact any existing statutory and contractual rights of such employee. Local 689 and its members do not risk losing rights to relief if the Court restrains and enjoins the arbitration; and

C. No WMATA employees were adversely affected as a result of the application of the 2012 Policy. And because the 2012 Policy has been replaced completely by the 2017 Screening Policy, there is no present or future risk of adverse impact to any WMATA employee arising from or relating to the 2012 Policy.

137. Leaving the subject matter of the arbitrations to arbitration harms the public interest in the underlying subject matter and in deciding the underlying subject matter. WMATA's criminal background screening policies and practices are too important, and the public interest in WMATA's criminal background screening policies and practices is too great and too important, to be left to arbitration. Additionally, the public interest in WMATA's criminal background screening policies and practices is too great and too important to be left to the substantive deficiencies, uncertainties, and vagaries of arbitration.

138. A temporary restraining order and preliminary and permanent injunctions are necessary to protect and to preserve (A) the public interest and (B) the rights and procedures guaranteed to the parties and other affected persons by the Federal Rules of Civil Procedure, augmented by judicial decisions, United States statutes, and the United States Constitution.

139. The harm that WMATA will suffer if injunctive relief is not granted far outweighs the harm, if there even is any, that would be suffered by Local 689 and its membership if injunctive relief were not granted.

140. The subject matter of this suit is ripe for adjudication.

141.    Local 689 fails and refuses to withdraw these grievances or the applicable underlying arbitration demands notwithstanding demand by WMATA.

**Relief Requested**

WHEREFORE, the Washington Metropolitan Area Transit Authority respectfully prays for the following relief:

1.    Preliminary and permanent injunctions and, if necessary, a temporary restraining order,

(a)    Restraining and enjoining the arbitration of the 2017 Grievance and the 2016 Grievance and any other grievance arising out of or relating to the 2012 Policy not already restrained and enjoined;

(b)    Restraining and enjoining Local 689 and all persons acting on behalf of or in concert with Local 689 from proceeding with and in the arbitration of the 2017 Grievance, the 2016 Grievance, and any other grievance arising out of or relating to the 2012 Policy not already restrained and enjoined;

(c)    Restraining and enjoining Local 689 and all persons acting on behalf of or in concert with Local 689 from proceeding with and in any and all other grievances and arbitrations alleging, based on, and/or seeking relief with respect to a disparate impact arising or resulting from the 2017 Screening Policy or the 2012 Policy;

(d)    Restraining and enjoining Local 689 and all persons acting on behalf of or in concert with Local 689 from proceeding with and in any and all other grievances and arbitrations alleging, based on, and/or seeking relief with respect to the 2017 Screening Policy or the 2012 Policy, excepting only the ability of a specific individual WMATA

employee who allegedly is adversely affected by the 2017 Screening Policy to pursue that individual employee's existing statutory and contractual rights; and

(e)     As otherwise are necessary or prudent to accomplish the results that WMATA seeks in this Complaint; and

2.     A declaratory judgment that the claims that Local 689 asserts in the 2017 Grievance, the 2014 Grievances, and 2016 Grievance are not arbitrable; and

3.     Such other and further relief as may be warranted or advisable or the Court may deem just and proper, including, but not limited to, an award to WMATA of costs and attorneys' fees for having to bring this action to enforce, among other things, a previous order of this Court.

Dated: June 8, 2018                              Respectfully submitted,

/s/ Kathleen E. Kraft
Kathleen E. Kraft (D.C. Bar No. 984445)
T: (202) 585-6922
F: (202) 508-1035
email: kkraft@thompsoncoburn.com

THOMPSON COBURN LLP
1909 K Street, N.W. Suite 600
Washington, D.C. 20006-1167
T: (202) 585-6900
F: (202) 585-6969

Counsel for Washington Metropolitan Area
Transit Authority

## VERIFICATION OF COMPLAINT

I, Tawnya Moore-McGee, declare:

1.      I am the Chief Human Resources Officer for Washington Metropolitan Area Transit Authority.

2.      I am over the age of 18. I make this verification on personal knowledge and information available to me, and I am competent to testify to the matters set forth herein.

3.      I have reviewed the Verified Complaint. I verify that the facts stated in the Verified Complaint have been assembled by authorized employees and counsel for Washington Metropolitan Area Transit Authority; and that the factual allegations therein are true and correct to the best of my knowledge, information, and belief.

4.      I also verify that the documents attached to the Complaint, and referenced below, have been assembled by authorized employees and counsel for Washington Metropolitan Area Transit Authority.

5.      Attached to the Complaint as Exhibit 1 is a true and accurate copy of the Collective Bargaining Agreement between Washington Metropolitan Area Transit Authority and Amalgamated Transit Union, Local 689 effective from July 1, 2012 through June 30, 2016.

6.      Attached to the Complaint as Exhibit 2 is a true and accurate copy of WMATA's Policy/Instruction 7.2.3/2 approved July 1, 2017.

7.      Attached to the Complaint as Exhibit 3 is a true and accurate copy of Grievance No. 9406 filed by Gerry Garnett of Local 689 on or about May 30, 2014 and Grievance No. 9407 filed by Gerry Garnett of Local 689 on or about May 30, 2014, initiating grievances as to the alleged discriminatory impact of WMATA's 2012 Policy, originally provided in *WMATA v. Local 689*, Civ. No. 1:15-cv-536 (RMC) (D.D.C.).

6756369                                        - 43 -

8.     Attached to the Complaint as Exhibit 4 is a true and accurate copy of a letter dated March 21, 2016 from Jackie Jeter of Local 689 to Gayle Gray in WMATA's Office of Labor Relations initiating a question grievance as to the alleged discriminatory impact of WMATA's 2012 Policy.

9.     Attached to the Complaint as Exhibit 5 is a true and accurate copy of a letter dated December 7, 2016 from Douglas Taylor, counsel to Local 689, to Gayle Gray of WMATA's Office of Labor Relations and accompanying Agreement on Background Check Question Dispute signed by Mr. Taylor and Ms. Gray on December 6, 2016 and December 7, 2016, respectively.

10.     Attached to the Complaint as Exhibit 6 is a true and accurate copy of a cover email dated May 24, 2018 from Douglas Taylor, counsel to Local 689, to Dan Pribich of WMATA's Office of Labor Relations and attached letter from Douglas Taylor dated May 17, 2018 concerning the background check dispute and Local 689's demand for revival of the 2014 Grievances and the 2016 Grievance, among other things.

11.     Attached to the Complaint as Exhibit 7 is a true and accurate copy of a cover email dated June 5, 2018 from Kathleen Kraft, counsel to WMATA, to Douglas Taylor, counsel to Local 689 and attached letter from Kathleen Kraft dated June 5, 2018 responding to Mr. Taylor's letter to Mr. Pribich of WMATA concerning the background check dispute and Local 689's demand to revive the 2014 Grievances and 2016 Grievance, among other things..

12.     Attached to the Complaint as Exhibit 8 is a true and accurate copy of an email from Douglas Taylor, counsel to Local 689, to Kathleen Kraft, counsel to WMATA, dated June 5, 2018, responding to Ms. Kraft's June 5, 2018 response to Local 689's demand for revival of

the 2014 Grievances and the 2016 Grievance, among other things, provided to Plaintiff WMATA by WMATA counsel.

13.     Attached to the Complaint as Exhibit 9 is a true and accurate copy of letter dated May 19, 2017 from Jackie Jeter of Local 689 to Gayle Gray in WMATA's Office of Labor Relations initiating a question grievance concerning the 2017 Screening Policy and the accompanying Local 689 grievance form.

14.     Attached to the Complaint as Exhibit 10 is a true and accurate copy of a letter dated August 15, 2017 to Jackie Jeter, President of Local 689, from Gayle Gray, then director of WMATA's Office of Labor Relations, setting forth WMATA's Step 4 Answer to Local 689's 2017 Grievance concerning the 2017 Screening Policy.

15.     Attached to the Complaint as Exhibit 11 is a true and accurate copy of an email exchange dated November 1, 2017 between Gayle Gray, then Director of WMATA's Office of Labor Relations, and Douglas Taylor, as counsel for Local 689, discussing WMATA's objections to arbitrating the 2017 Grievance and Local 689's response.

16.     I declare under penalty of perjury that the foregoing is true and correct.

[signature page follows]

Executed in Washington, D.C. on June __8__, 2018.

Tawnya Moore-McGee